FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2025 MAR 10 AM10 02
CAROL L. MICHEL, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**FELONY**

BILL OF INFORMATION FOR
CONSPIRACY TO COMMIT HEALTH CARE FRAUD

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 25-0051 |
| v. | * | SECTION: SECT. M MAG. 2 |
| ROBERT TASSIN, M.D. | * | VIOLATION: 18 U.S.C. § 1349 |

\* \* \*

The United States Attorney charges that:

## COUNT 1

**A.   AT ALL TIMES RELEVANT HEREIN:**

### The Medicare Program

1.   The Medicare Program ("Medicare") was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"). Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."

2.   Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

✓ Fee   USA
___ Process
X   Dktd
___ CtRmDep
___ Doc.No.

3. Medicare covered different types of benefits and was separated into different program "parts," including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covered, among other things, genetic testing, when certain criteria were met.

4. Medicare "providers" included physicians, independent clinical laboratories, and other health care providers who provided services to beneficiaries. To bill Medicare, a provider was required to submit a Provider Enrollment Application to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5. A Medicare "provider number" was assigned to a provider upon approval of the Provider Enrollment Application. A provider that obtained a Medicare provider number was able to file claims with Medicare to obtain reimbursement for benefits, items, or services rendered to beneficiaries. When seeking reimbursement from Medicare for provided benefits, items, or services, providers submitted the cost of the benefit, item, or service provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System.

6. When submitting claims to Medicare for reimbursement, providers certified that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in

2

compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, were medically necessary.

7. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

8. Medicare would not reimburse providers for claims that were not medically reasonable or necessary, or procured through the payment of kickbacks and bribes.

### Cancer Genetic Testing

9. Except for limited statutory exceptions, Medicare only reimbursed clinical laboratories for tests that were "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Further, to be reimbursable by Medicare, "[a]ll diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a).

10. Cancer genetic tests ("CGx" tests) were laboratory tests that used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. Genetic testing did not determine whether an individual had a disease, such as cancer, at the time of the test.

3

11. Because genetic testing did not diagnose diseases or conditions, Medicare only covered such as tests in limited circumstances, such where the genetic testing was ordered by a physician in treating a beneficiary's cancer or to inform a beneficiary's drug therapy, and the results were used in the management of the beneficiary's cancer or drug therapy.

### The Defendant and Related Individuals and Entities

12. **ROBERT TASSIN, M.D. ("TASSIN")**, a resident of Slidell, Louisiana, was a physician licensed to practice medicine in Louisiana. **TASSIN** applied for and obtained a Medicare provider number, and in doing so, agreed to abide by all the terms, laws, and regulations of Medicare, including the Federal Anti-Kickback Statute.

13. Company 1 was a Georgia limited liability company that operated as a telemedicine staffing company.

14. Laboratory 1 was a purported diagnostic laboratory with a principal place of business in Oklahoma City, Oklahoma.

15. Laboratory 2 was a purported diagnostic laboratory with a principal place of business in New Orleans, Louisiana. Laboratory 1 and Laboratory 2 were owned by Individual 1, a resident of Lawrenceville, Georgia.

16. Laboratory 3 was a diagnostic laboratory with a principal place of business in Monroe, Louisiana (collectively, with Laboratory 1 and Laboratory 2, "Laboratories 1-3"). Laboratory 3 was owned by Individual 2, a resident of Sterlington, Louisiana.

**B.   THE CONSPIRACY:**

Beginning in or around February 2019, and continuing through in or around September 2019, in the Eastern District of Louisiana, and elsewhere, the defendant, **ROBERT TASSIN, M.D.**, did knowingly and willfully conspire with others known and unknown to the United States

Attorney, to execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

C. **PURPOSE OF THE CONSPIRACY:**

The purpose of the conspiracy was for **TASSIN** and his co-conspirators to unlawfully enrich themselves by, among other things:

1. Offering, paying, soliciting, and receiving kickbacks and bribes in exchange for the furnishing and arranging of doctors' orders for CGx testing along with other documentation necessary to submit claims to Medicare;

2. submitting and causing the submission of false and fraudulent claims to Medicare for CGx testing, including testing purportedly rendered to beneficiaries located in the Eastern District of Louisiana and elsewhere;

3. receiving and obtaining the reimbursements paid by Medicare based on the false and fraudulent claims submitted;

4. concealing the lack of medical necessity for the CGx testing, and the submission of false and fraudulent claims to Medicare; and

5. diverting proceeds of the fraud for the personal use and benefit of the defendant and others.

D. **MANNER AND MEANS OF THE CONSPIRACY:**

The manner and means by which **TASSIN** and his co-conspirators sought to accomplish the objects and purpose of the scheme included, among others, the following:

1. **TASSIN** enrolled with Medicare, at which time **TASSIN** certified that he would comply with all Medicare rules and regulations, including that he would not knowingly present or cause to be presented a false or fraudulent claim for payment to Medicare and would not violate the Federal Anti-Kickback Statute.

2. **TASSIN**, though Company 1, worked as an independent contractor for various purported telemedicine companies.

3. These purported telemedicine companies and certain laboratories, including Laboratories 1-3, gained access to personal information for thousands of beneficiaries, including beneficiaries in the Eastern District of Louisiana, and forwarded the information onto **TASSIN** and other providers to sign orders for CGx testing.

4. **TASSIN**, for his part, in the Eastern District of Louisiana and elsewhere, signed orders for CGx testing for beneficiaries based on the information provided to him, in exchange for payment. The CGx testing orders were not the product of a doctor-patient relationship and proper examination, not medically necessary, and not eligible for reimbursement by Medicare. Specifically, **TASSIN** never met, treated, or examined the beneficiaries for whom he ordered testing, nor did he receive or use the CGx test results. Instead, **TASSIN** typically briefly reviewed, through a telemedicine platform, materials related to a purported conversation between a beneficiary and a third-party call center employee, ordered the medically unnecessary CGx testing, and collected payment.

5. In exchange for each CGx testing order authorizing medically unnecessary CGx testing, **TASSIN** received thirty dollars. In total, for his participation in the scheme, **TASSIN** was paid approximately $106,757 in illegal kickbacks from telemedicine companies, including Company 1.

6. In furtherance of the scheme, **TASSIN** falsely certified in medical records in support of the false and fraudulent claims that the CGx tests were medically necessary for the patient's treatment.

7. **TASSIN** received complaints from beneficiaries that they either had not ordered the CGx testing, not received the testing, or were concerned about the high price of the testing, but **TASSIN** continued to sign CGx testing orders and collect payment.

8. The CGx testing orders **TASSIN** signed were used by Laboratory 1-3, among others, to submit claims to Medicare and collect reimbursement for the medically unnecessary orders. The orders often requested tens of thousands of dollars of CGx testing per patient.

9. From in or around February 2019, and continuing through in or around September 2019, in the Eastern District of Louisiana, and elsewhere, **TASSIN**, in conspiracy with others, caused the submission of approximately $6,696,069.02 in false and fraudulent claims to Medicare for CGx testing by Laboratories 1-3 and others, that were medically unnecessary, procured through the payment of kickbacks and bribes, and ineligible for reimbursement. Medicare paid approximately $2,043,542.23 for these claims.

All in violation of Title 18, United States Code, Section 1349.

## NOTICE OF FORFEITURE

1. The allegations of Count 1 of this Bill of Information are incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States.

2. As a result of the offense alleged in Count 1, the defendant, **ROBERT TASSIN, M.D.**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall seek a money judgment and, pursuant to Title 21, United States Code, Section 853(p), forfeiture of any other property of the defendant up to the value of said property.

MICHAEL M. SIMPSON
ACTING UNITED STATES ATTORNEY

LORINDA LARYEA
ACTING CHIEF, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

_Nick Moses for K.W._
KELLY Z. WALTERS
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

_[signature]_
NICHOLAS D. MOSES
Assistant United States Attorney
Eastern District of Louisiana

New Orleans, Louisiana
March 10, 2025

No. _____

# United States District Court

FOR THE

EASTERN _____ DISTRICT OF _____ LOUISIANA

UNITED STATES OF AMERICA

vs.

ROBERT TASSIN, M.D.

BILL OF INFORMATION FOR
CONSPIRACY TO COMMIT HEALTH CARE FRAUD

Violation(s):    18 U.S.C. § 1349

Filed _____, 20 _25_

_____, Clerk.

By _____

_____, Deputy

NICHOLAS D. MOSES
Assistant United States Attorney